Nashawin **BOLTON,** Jerome Waldo, and Dwight Clark, and all others similarly situated, Plaintiffs,

v.

Glenn **GOORD,** Commissioner of the New York State Department of Correctional Services, Philip Coombe and John P. Keane, Superintendent, Woodbourne Correctional Facility, Defendants.

No. 95CV3768 (SHS).

United States District Court, S.D. New York.

Jan. 23, 1998.

Amended Jan. 23, 1998.

Alexander R. Sussman, Fried, Frank, Harris, Scriver & Jacobsen, New York, NY, for Plaintiff.

Stephen M. Jacoby, Dennis C. Vacco, Atty. Gen., New York, NY, for Defendants.

## OPINION, FINDINGS OF FACT & CONCLUSIONS OF LAW

STEIN, District Judge.

This civil rights action brought pursuant to 42 U.S.C. § 1983 challenges the New York State practice of "double-celling"—housing two inmates in a prison cell previously used to house one inmate—at Woodbourne Correctional Facility ("Woodbourne") as violative of the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiffs claim that the conditions of confinement for double-celled inmates constitute cruel and

unusual punishment proscribed by the Eight Amendment and that double-celling violated plaintiffs' due process rights secured by the Fourteenth Amendment. Plaintiffs seek injunctive and declaratory relief against all defendants and monetary damages against one individual defendant, Philip Coombe. The action was tried to this Court without a jury over the course of three weeks in May 1997; testimony was adduced from thirty-nine witnesses and in excess of 150 exhibits were introduced into evidence. After careful consideration of all the evidence, this Court concludes that plaintiffs have not prevailed.

■■■ The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain" or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Only conditions of confinement which constitute or cause the "serious deprivation of basic human needs," which are the "minimal civilized measure of life's necessities," constitute cruel and unusual punishment. *Id.* Although double-celling can amount to an Eighth Amendment violation if combined with other adverse conditions, this Court finds that double-celling at Woodbourne, under the conditions set forth at trial, does not constitute cruel and unusual punishment as proscribed by the Eighth Amendment.

Plaintiffs' due process claim fails as well. Plaintiffs have failed to show that they suffered an "atypical and significant hardship .... in relation to the ordinary incidents of prison life," *see Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995), or that New York State has granted its inmates, by regulation or statute, a protected liberty interest in being free from being placed in a double cell. Indeed, far from being atypical, most state prison systems as well as the federal prisons had adopted a policy of some double-celling of inmates by 1995.

## I. The Parties

Plaintiffs Nashawin Bolton, Jerome Waldo and Dwight Clark are inmates who were at one point in time double-celled at Woodbourne. Mr. Bolton was double-celled from April 1995 until June 1995 (Tr. at 789–91, 804–05 (Bolton)),[1] Mr. Clark from April 1995 until July 1995 (Tr. at 835–37 (Clark)), and Mr. Waldo from approximately April 1995 until June 1995. Tr. at 135–36, 140–42 (Waldo). Defendant Glenn Goord is the current Commissioner of the New York State Department of Correctional Services ("DOCS"). Defendant Philip Coombe was the acting Commissioner of DOCS from approximately August 1994 to April 1996. Defendant John Keane is the current Superintendent of Woodbourne. Plaintiffs bring claims against Goord and Keane in their representative capacity and against Coombe in his individual capacity and seek money damages solely from Coombe.

## II. Findings of Fact

### The Decision To Commence Double–Celling In New York State Prisons

1. At the time of trial, there were approximately 70,000 inmates in the DOCS system. Tr. at 1496 (Alexander). In 1989, in order to house what was an increasing number of prisoners, DOCS began to double-bunk inmates in dormitories in certain of its facilities, including Woodbourne. Tr. at 636–37 (Coombe). "Double-bunking" is the practice of having two inmates sleep one above the other in bunk beds. This initially was accomplished by converting gymnasiums into dormitories. *Id.* Each of these converted gymnasiums housed approximately two hundred inmates in double bunks. *Id.* Double-bunking inmates was intended to be a temporary solution to the problem of increasing prison populations. Tr. 639 (Coombe).

2. Former DOCS Commissioner Coombe sought to avoid double-celling inmates as long as possible. Tr. 754 (Coombe). Due to a number of factors, he was forced to address double-celling as a potential housing solution. In April of 1994, the state legislature institut-

---

1. References to "Tr. at ___ (_____)" are references to the trial transcript of this action along with the witness' name.

ed a change in New York State's work release program, which increased the amount of time that inmates who had committed homicides or sexual offenses had to serve before being permitted to go out on work release. Tr. 756 (Coombe). In addition to an increase in the inmate population, the composition of the population was shifting toward an increase in violent felons as opposed to the trend in the 1980's in which many inmates had been sentenced to jail as a result of "nonviolent," drug related crimes. Tr. 746 (Coombe). Because of this change, Coombe believed that DOCS should stop creating dormitory housing. Tr. 755 (Coombe). He believed that the shortage of living quarters needed to be resolved by keeping more prisoners in cells, as opposed to open dormitory spaces. Tr. 758 (Coombe).

3. DOCS was also under numerous court orders requiring it to receive inmates into state custody in a timely manner. Tr. 761–62 (Coombe). Moreover, DOCS needed to make significant budget cuts. Tr. 755 (Coombe). Double-celling was regarded as a cost-neutral way of absorbing the additional population and accounting for the change in the composition of the prison population. Tr. 755 (Coombe).

### Planning and Implementation of Double-Celling

4. Prior to implementing double-celling, Coombe formed a team of superintendents and deputy commissioners and directed them to visit facilities in other states that utilized double-celling to research their double-celling procedures and problems. Tr. 765 (Coombe).

5. The committee researched double-celling in California, Texas, Pennsylvania, Michigan and Florida. P–2, 3, 4 & 5.[2]

6. Thereafter, discussions were held between members of the committee and personnel from a variety of New York state correctional facilities, including representatives from DOCS Division of Health Services regarding health and safety considerations. The resulting guidelines precluded the following categories of inmates from being double celled: the mentally disturbed, the physically disabled, victim prone, those who exhibit aggressive behavior and those with communicable diseases. Tr. 658 (Coombe); P–241.

### Planning for Double–Celling at Woodbourne

7. The initial planning for double-celling at Woodbourne involved team meetings, conversations with the inmate population, and feedback from facility staff. The heads of each of the areas that would be most affected by double-celling—security, programs, medical, and administration—was involved in the planning process, which was completed under the direction of then Superintendent Robert Hanslmaier. Tr. 933–34 (Krom).

8. In late February or early March 1995, Superintendent Hanslmaier informed the executive staff of Woodbourne that they would be receiving additional inmates and should finalize the double-celling plans. Formal meetings were held with the inmate liaison committee (ILC), as well as discussions with inmates informally, to determine the best way to implement double-celling. Team members also spoke to corrections sergeants, lieutenants, and various unions at Woodbourne. Tr. 934–935 (Krom), Tr. 1036–1037 (Jones), Tr. 1047 (Jones). As a result of meetings with the ILC, Woodbourne decided to double cell inmates based on seniority on each gallery. Tr. 937–938 (Krom).

### State Commission of Correction

9. The New York State Commission of Correction ("SCOC") is an oversight body, separate and independent from DOCS, which assists the Governor in developing policies, plans and programs for improving the administration of both state and local correctional facilities. The SCOC has the power to promulgate rules and regulations establishing minimum standards for the care and custody of persons confined in correctional facilities. Tr.1960 (Wutzer Stip).

10. In late 1994 or early 1995, the SCOC began to consider promulgating a regulation

---

**2.** References to "P–___" and "D–___" are to Plaintiffs' exhibits and Defendants' exhibits, respectively.

authorizing double-celling in New York. Tr.1960–61 (Wutzer Stip.). Thomas Harig, of SCOC's Office of Program & Policy Analysis, spoke with officials from other jurisdictions and reported on his findings to the SCOC. He found that the majority of federal facilities were double celled. Low and minimum security facilities were completely double-celled, medium security facilities were 50% double-celled, and maximum security facilities were 25% double-celled. The average size of the double cells in older facilities was 60 square feet. P–6, p. 2.

11. An SCOC emergency regulation which provided that DOCS "may establish double occupancy housing units" with the approval of SCOC was published in the New York State Register on May 17, 1995. Tr.1962 (Wutzer Stip.). The regulation required certain equipment, furniture and fixtures, and provided for a screening and risk assessment of inmates prior to housing them in a double cell. N.Y. State Register, May 17, 1995, p. 1; *see also* N.Y. State Register, August 9, 1995, p. 6 & October 4, 1995, p. 1.

12. At a meeting on April 26, 1995, the SCOC approved double-celling at Woodbourne. D–60.

### Woodbourne Correctional Facility

13. Woodbourne was originally built in the 1930's, and at that time included cell blocks A & B. In the late 1960's, cell blocks C & D were added, and in the 1970's a new administration building and gymnasium were added and the hospital building was expanded. Tr. 1735–37 (Miller). Each of the cell blocks has four floors. There are 260 cells in A & B blocks, and 240 in C & D blocks. Woodbourne also has various dormitory-style housing units. Tr. 1737–1738 (Miller); D–2, p. 1.

14. The first floors of A and B block have one shower, and the remaining floors each have three showers. Each floor of C and D blocks has four showers. Showers are also available in the gym. Tr. 1737–1738 (Miller). There is one recreation room—also referred to as the day room—on each floor of C & D blocks, one recreation room that serves the first and second floors of A & B block, and another that serves the third and fourth floor. Tr. 1737–1738 (Miller).

15. Certain housing units are designated for inmates assigned to specific jobs or programs. For example, A block primarily houses inmates who work in the dining hall. D–1 houses inmates in the veterans program, a residential therapeutic program for combat veterans, and D–4 houses inmates participating in the network program, another residential therapeutic program. Tr. 1737 (Miller); D–30, p. 7–8.

16. The number of inmates housed at Woodbourne has fluctuated over the last decade. In 1989, there were 891 beds. Woodbourne then created a dormitory, known as "G" dorm, where 149 inmates were double bunked. At that time, the population was approximately 1,040, the highest it has been in the past decade. Tr. 1740–1742 (Miller); Tr. 895 (Krom). Woodbourne also had dormitories set up in the basement of C and B blocks. Tr. 896 (Krom). In 1991, these dorms were closed and the population of G dorm was reduced to 62. Tr. 1741 (Miller); D–2, p. 2.

17. In 1995, prior to the implementation of double-celling, Woodbourne's population was 891. In April of 1995, when double-celling was first implemented, Woodbourne double-celled 56 of its 500 cells and added 34 additional double bunks to its dormitories, for a total of 90 additional inmates, bringing the population to 981. Tr. 1740–1741 (Miller).

18. The cells in A and B block are approximately 58.6 square feet, and those in C and D blocks are approximately 53.3 square feet. Tr. 447 (Duel); P–417. The cells used as double cells are equipped with a bunk bed, a sink with running hot and cold water, a toilet, four lockers, and a folding chair. D–1.

19. Woodbourne publishes a schematic or floor plan indicating approved ways in which inmates may arrange the furniture in their cells. When Woodbourne officials formulated the floor plan for double cells, they intended inmates to use the folding chair to get into the top bunk. Inmates, however, have stood on the lower rail of the lower bunk, the lockers or the toilet in order to get into the

top bunk. Tr. 1760–1762 (Miller); D–30, p. 30, D–34a–d.

20. Currently, and since 1989, the hot water provided to the showers operates with anti-scald valves. Tr. 1745, 1771 (Miller). By the time of trial, valves that will allow the water temperature to be regulated in all areas, including the sinks in the cells, had been ordered. Tr. 1745 (Miller).

21. Woodbourne has a medical unit that provides health care 24 hours a day, seven days a week. It is staffed by one full time and one part-time physician, as well as 7.5 nurses and other support staff. Tr. 1124–1125 (Williams); Tr. 1531 (Macram). Two additional nurses have been added since the beginning of double-celling. Tr. 1536 (Macram).

22. The majority of inmates coming to Woodbourne are sent there on the basis of good behavior at other penal institutions. Inmates are screened prior to being accepted into Woodbourne. Tr. 932 (Krom).

23. Woodbourne offers a variety of educational, vocational, religious and recreational programs. D–3, p. 1; Tr.1955–1956 (Kowalik Stip.); D–30, p. 3. Inmates can also be assigned jobs in the following areas: laundry, hospital, kitchen, maintenance, carpentry, painting, plumbing and electric. *Id.* Inmates known as Inmate Program Assistants function as tutors to other inmates. D–30, p. 2.

24. Woodbourne has a gymnasium and a recreation yard with built-in board games and weight lifting equipment; it also has an enclosed softball field. Tr.1950 (Tucker Stip.). A visiting program permits inmates to receive visitors from 9 a.m. to 3 p.m. on alternate weekend days. A Family Reunion Program allows inmates to have 48 hour overnight visits with their families at nearby Sullivan Correctional Facility. Tr.1952 (Tucker Stip.).

25. Inmate organizations also meet regularly, and include organizations such as the NAACP, the Brothers of Ireland, and the Jaycees. Tr.1951 (Tucker Stip.). Woodbourne employs Protestant, Catholic, Muslim and Jewish clergy, and religious services are provided for all major faiths. On religious holidays, special activities are held. Tr.1952 (Tucker Stip.), Tr. 379–380 (Nicholas).

26. Weekdays at Woodbourne are divided into three time periods, referred to as modules: 8:30 – 11:30 a.m., 12:30 – 3:30 p.m., and 6:30 – 9:30 p.m. Any inmate who is under 65 years of age and is medically able to work must work or be in a program for two periods every day. Tr.1955 (Kowalik Stip.). During periods when an inmate does not have an assigned program, he may elect to go to the recreation yard, the library, or the gym. Tr. 1751 (Miller); Tr.1955 (Kowalik Stip.); D–30, p. 5.

27. Inmates at Woodbourne are generally required to remain in their cells for approximately 10–12 hours per day. Inmates are locked in their cells from 11:00 p.m. to 7:00 a.m. Each company goes to breakfast sometime between 7:00 and 8:15 a.m. As noted, programs are held from 8:30 a.m. to 11:30 a.m. At 11:30, inmates return to their housing unit. During the period 11:30 a.m. to 12:30 p.m., a count is held and the inmates go to lunch. From 12:30 to 3:30 p.m., programs are held, and from 3:30 to 4:00 p.m. inmates may go to the yard or to the commissary to make purchases. From 4:00 p.m. to 6:00 p.m., inmates are permitted to shower and each housing unit goes to dinner. Another count is then held until approximately 6:30 p.m. Programs are also held from 6:30 to 9:30 p.m. At 9:30 p.m., inmates return to their housing unit, and may stay in the day room until 11:00 p.m. Tr. 1748–1751, 1786 (Miller).

28. The counts generally last one-half hour, but can take up to 1 .5 hours if there is a problem. An inmate may also be in his cell for 15 to 20 minutes before or after lunch. Thus, aside from the 8 hour overnight period—during which inmates are generally asleep—they are required to be in their cells an additional 1.5 to 2 hours. Tr. 839 (Clark); Tr. 1749–50 (Miller).

29. Woodbourne was first accredited by the American Correctional Association ("ACA") in 1989, and was reaccredited in 1993 (D–306) and 1996 (D–102); Tr. 1746 (Miller). In order to be accredited, a facility must meet 100 percent of the ACA's mandatory standards and 90 percent of its non-

mandatory standards. Tr. 692–93 (Coombe). In 1996, the ACA found that Woodbourne met 100% of the 39 mandatory standards, and 96.8% of the non-mandatory standards. Of the 441 non-mandatory standards, 25 were found to be inapplicable to Woodbourne, and Woodbourne was found not in compliance with 13. Certain of the non-mandatory standards did not pertain to the health and safety of inmates, such as the terms of the Superintendent's employment (Standard 3–4010), the organization of the management units (Standards 3–4123 and 3–4124), and the timing of an appeal of a disciplinary determination (Standard 3–4236). D–260.

30. Woodbourne was found to be housing more inmates than its rated capacity, failed to meet the standard requiring one shower per every eight inmates and failed to meet the standard regarding physical examinations for non-security personnel. Woodbourne also failed to meet the square footage requirements regarding unencumbered space in cells.

### Security Classification

31. Some inmates are classified specially by an extended classification unit of Movement and Control. These include vulnerable inmates and learning disabled inmates. Protective custody units and special programs for vulnerable inmates exist at several DOCS facilities. Tr. 1490 (Alexander).

32. The system excludes from transfer to Woodbourne inmates with serious assaultive behavior or those serving lengthy sentences. D–82 at 3.

33. Pursuant to DOCS' inmate security classification system, aggressive homosexual inmates are placed in maximum security facilities. Overt homosexuals are carefully evaluated before being placed in a security level lower than maximum. Vulnerable or victim prone inmates are subject to separate evaluation. D–106 at Bates 14322–14324.

34. Inmates coming to Woodbourne include medium security level inmates who have at least two years of good behavior who are eligible for transfer closer to home in the greater New York area, a small number of medium security level inmates right out of reception facilities, and inmates from maximum security facilities whose classification is being reduced because of good behavior and a short remaining sentence time. Tr. 1489 (Alexander).

### Security Screening

35. Plaintiffs contend that the security screening of inmates prior to double-celling them at Woodbourne is inadequate and thus places inmates in risk of serious harm or violence. The evidence did not support plaintiffs' contention. When an inmate is transferred from one facility to another, the sending facility sends an E-mail to the receiving facility indicating that the inmate is on his way. Tr. 897 (Krom), Tr. 1038–1039 (Jones). Beginning in approximately June 1995, the E-mail contained a recommendation as to whether the inmate should be double-celled. The form of this recommendation was "Double cell: Y/N". Tr. 898–899, 902 (Krom), Tr. 1040 (Jones), P–290, p. 1.

36. When double-celling was commenced at Woodbourne, the review of the inmate's records was done by the sending facility. Tr. 904–05 (Krom). The E-mail was received by the inmate records coordinator at Woodbourne, who then sent it to the movement and control officer. Tr. 905 (Krom).

37. Captain Ronald Krom relied on the E-mail from the sending facility as a means of screening inmates for double-celling. Tr. 955 (Krom).

38. Krom tried to speak to each of the initial fifty-six inmates who were already at Woodbourne and were to be double celled. Additionally, a list of these inmates was sent to the mental hygiene and medical departments and to the disciplinary lieutenant for their review. Tr. 939–40 (Krom).

39. As a result of circulating the list and his personal interviews, Krom excluded three or four individuals from double-celling. One inmate was excluded because he had been attacked in another facility and was visibly shaking during his interview with Krom, another because he had an embarrassing medical condition, and another inmate because he had been raped. Tr. 939–942 (Krom). Krom told each of the initial 56 inmates that if they had any problems with double-celling, they

could write to or speak directly with him. Tr. 942–943 (Krom).

40. Krom spoke with the initial 56 inmates collectively and explained the double-celling policy, the different programs available at Woodbourne that would help them move more quickly out of double-celling, and that they could request different types of housing by writing to him. Krom also had the area sergeant with him so that the sergeant would know what to tell new arrivals at later dates. Tr. 943–44 (Krom).

41. After the collective speech, each inmate was interviewed by the area sergeant, and Krom made himself available if any inmate wanted to speak to him privately. If any problems were identified, the inmate was not double-celled. Tr. 944–945 (Krom). After the individual interviews, the inmates were brought up to the medical unit and their medical records were screened. Tr. 945–946 (Krom). The inmates were also psychologically screened. Tr. 946 (Krom). The counseling department also produced a report based on a review of the inmates' records which is used in the screening and contained, among other things, the inmate's ethnic background, his psychological and medical history, and misbehavior problems. This counseling report was sent to the superintendent and circulated to the executive team. Tr. 948 (Krom).

42. After the initial round of double-celling, incoming inmates went into housing based on availability, subject to the same screening as described for the initial inmates placed in double cells, except that the group speeches and individual interviews were all performed by a sergeant. Tr. 952, 954 (Krom).

43. Krom wrote instructions that were given to all inmates at Woodbourne, which explained how an inmate could request a change in his housing assignment. Tr. 958–59 (Krom); D–10; D–11; D–12. Just before Krom left Woodbourne in December 1995, the facility developed a form that each inmate was given when they arrived at the facility, and which was made available to all inmates at Woodbourne to request different types of housing. Tr. 961 (Krom); D–326.

44. Larry Austin, an inmate movement and control officer at Woodbourne, works with the captain in assigning inmates their cell locations. Tr. 1059, 1070 (Austin). Based on the E-mail that comes from the sending facility, he records the inmate's name, identification number, parole board date, keeplock status, and the double cell recommendation from the sending facility, on a Rolodex card. He then goes onto the DOCS' computer system and checks the inmate's ethnic background, his keeplock status, if he has had any unusual incidents, his mental health level, and his enemies list. Tr. 1070–71 (Austin). He also records the captain's double-celling determination on the Rolodex card. Tr. 1072 (Austin).

45. Carola Porter is the program sergeant at Woodbourne and is responsible for the initial screening of inmates at Woodbourne. Tr. 1501 (Porter). When inmates arrive at Woodbourne they are given a group speech by a sergeant. In this speech, they are asked if they have been at Woodbourne before and if anyone is currently on keeplock status. Tr. 1502 (Porter). The inmates are told that Woodbourne is primarily a dormitory facility and that there are cells available on a first come, first serve basis. The sergeant explains that there are waiting lists for the various types of housing and that they will be given a housing selection form to fill out. Tr. 1501–1503 (Porter).

46. After the group speech, each inmate is interviewed individually. Tr. 1503 (Porter). In the individual interview, the sergeant gives the inmate a copy of the Woodbourne inmate handbook, which explains any rules and regulations specific to Woodbourne. The inmate is also given a copy of the double-celling procedure and is asked to sign an acknowledgment that he has received the handbook and the double-celling procedure. Tr. 1503–1505 (Porter), D–30; D–31; D–32; D–35.

47. During the interview, the sergeant fills out another form from the information given by the inmate which indicates whether he has any enemies, any medical or mental health problems, and if he is on any medications. Tr. 1506–1507 (Porter), D–34. The sergeant then uses this information to ensure

that the inmate's initial housing assignment is appropriate. Tr. 1507 (Porter).

48. During the individual interview, the sergeant gives the inmate a housing style change request form and explains how to fill it out. She tells them that as new inmates, they are entitled to select one of the first six choices on the form: first available double cell or double dorm, first available double cell only, first available double dorm only, first available single cell or single dorm, first available single cell only, first available single dorm only. The sergeant explains that if the inmate chooses first available single cell only or first available single dorm only, it will take "significantly longer" than the other choices. If an inmate tells the sergeant that he does not want to be in a double cell, the sergeant usually recommends that he choose first available double dorm, which can usually be accomplished in a "matter of days." Tr. 1509–11 (Porter), Tr. 1057–58 (Jones), Tr. 1588 (Piatek). The sergeant then explains that once the inmate is in the double dorm, he can then fill out another housing form and request his top choice which might take longer to receive. Tr. 1509–12 (Porter). The sergeant will go over the form as many times as necessary to make certain that the inmate understands how the process works. Tr. 1513 (Porter); P–28.

49. Woodbourne maintains a log book for each housing option, and each time an inmate request comes in, it is written on a list in the log book. Tr. 1074 (Austin).

50. At some point in late 1995 or early 1996, Woodbourne started using a form titled "double cell evaluation." The forms are filled out by the captain from information obtained from the DOCS' computer system regarding each inmate. The form has a section that lists twelve categories that are checked "yes" or "no," and can be explained in a "comments" section. Tr. 1040–42 (Jones). If one of the categories is checked "yes," the captain will look more closely at that factor, but this will not automatically exclude an inmate from double-celling. Tr. 1580 (Piatek). The captain then indicates whether he approves or disapproves the inmate for double-celling, subject to mental health and medical approval or disapproval,

which comes from the medical department after the inmate is seen on the day he arrives. Tr. 1042–44 (Jones); Tr. 1580–85 (Piatek); P–291; D–35.

51. Plaintiffs also contend that Woodbourne does not screen for compatibility of cellmates prior to double-celling them. The evidence demonstrated, however, that Woodbourne did engage in compatibility screening, albeit an informal one. For example, before placing an inmate in a double cell, the facility determines which inmate is already in the cell. Tr. 1594–95 (Piatek). More importantly, however, there was substantial evidence that inmates were not harmed by the lack of a formal compatibility screening since any problems that arose were addressed. Tr. 949–50 (Krom), Tr. 1047 (Jones), Tr. 1585–87 (Piatek). For example, in the event of smoking conflicts between cellmates, an attempt would be made to resolve the conflict by speaking with the two inmates and the area sergeant. If the problem could not be resolved, one inmate would be moved. Tr. 956–57 (Krom), Tr. 1047–48 (Jones), Tr. 1586 (Piatek). Conflicts between inmates involving religion, light, noise and hygiene have also been addressed and resolved. Tr. 957 (Krom); Tr. 1048 (Jones).

52. This Court credits Captain Piatek's testimony that the screening that he and the security staff do before an inmate is placed in a double cell is adequate to protect the inmates from harm or the risk of harm. Tr. 1589 (Piatek).

### Medical Screening and Services

53. DOCS conducts a health screening program for all inmates. When inmates are first taken into state custody they are seen by medical staff at a reception facility, where a medical history is taken and a physical exam performed. Blood and urine are tested, including blood screening for hepatitis. A PPD test for tuberculosis ("TB") infection is given and a chest x-ray is taken. Diphtheria-tetanus immunizations are given and, depending upon whether there is a record of the inmate being fully immunized as a child, vaccinations and immunizations for polio, measles and rubella are administered. If an inmate has a sentence greater than five

years, DOCS offers a hepatitis B vaccine. Tr. 1410–11 (Wright); D–174.

54. Inmates are also screened when they are transferred between facilities. P–30. An inmate's medical chart is reviewed, including a form filled out by the sending facility noting any problems. A nurse speaks with the inmate, asking whether he has any current medical problems. The nurse does a physical assessment, taking weight and vital signs, including blood pressure, temperature, pulse, and respiration. If necessary, a complete physical examination is performed. The nurse checks the lab results and x-rays and ensures that the inmate's PPD test is current. If an inmate has not been tested for HIV, he is asked if he would like an HIV test. Tr. 1085, 1128 (Williams,), Tr. 1518–19 (Sweeney); Tr. 1128–29 (Williams).

55. DOCS also has written policies concerning the delivery of health services, including diagnosis and treatment of diseases such as TB, hepatitis, asthma, and diabetes. Tr. 1408–09 (Wright); Tr. 1124–25 (Williams), Tr. 1546–47 (Macram).

56. In particular, DOCS has a TB control policy set forth in item 1.18 of its Health Services Policy Manual, which requires all inmates to be screened for TB with a PPD skin test, commonly known as the Mantoux test, and a chest x-ray upon entry into the DOCS system. Tr. 1431–35 (Wright). If an inmate tests positive on a PPD test, it means he has been exposed to tuberculosis but it does not mean that he has active TB. Tr. 1133 (Williams).

57. Thereafter, all inmates who have not previously tested positive are required to have an annual follow-up PPD test. Those who work in high risk areas such as the health services unit are screened for TB infection every 6 months. If the test is positive, the inmate is evaluated for signs and symptoms of active TB through a physical examination and a chest x-ray. All inmates with a positive PPD test are offered an HIV test. D–42, p. 6. If an inmate is known to be HIV positive, an anergy test is given. A person who has a positive PPD test or is found to be "anergic" is offered preventive therapy with a drug known as INH, which has been shown to substantially reduce one's chances of developing TB. D–167, p. 45. These procedures have been implemented at Woodbourne. Tr. 1133–34 (Williams), Tr.1953–54 (Pike Stip.).

58. If an inmate is suspected of having TB, he is isolated, evaluated and tested. Tr. 1431–33 (Wright).

59. Woodbourne does not have an isolation room for TB meeting the negative air flow criteria suggested by the Centers for Disease Control and Prevention (CDC). Instead, the inmate is masked and is kept in a separate room, until he is moved to an isolation room at another facility. See D–37, p. 17. An inmate is not released from isolation after a positive sputum smear until he has completed two weeks of therapy, is clinically improving, and three consecutive sputum smears are negative. If *all* sputum smears are negative (i.e. the patient never had a positive smear and was merely a suspect case or was diagnosed on the basis of clinical symptoms alone), he is released after three negative smear samples and his symptoms are improving with therapy directed toward another disease such as bronchitis or pneumonia. Tr. 1432 (Wright), D–42, p. 11–12. This policy is consistent with the CDC recommendations. D–37, p. 18.

60. DOCS' policy specifies the type and duration of drug therapy for both TB disease and preventive therapy for TB infection. D–42, p. 15–21. Preventive therapy is generally continued for six months for patients without known HIV infection or HIV risk factors, and for 12 months for those who are HIV infected or suspected to have HIV infection. D–42, p 17. Treatment of TB is continued for at least three months if all cultures are negative, and for at least six months in a case where there have been positive cultures. If an inmate is also infected with HIV, treatment is continued for one year, and if an inmate has multi-drug resistant TB, treatment is continued for two years. Tr. 1434 (Wright), D–42, p. 20. All treatment, including preventive therapy, is administered by what is referred to as "directly observed" therapy. A health care provider observes the patient place the medication in his mouth

and swallow, and then inspects the mouth for unswallowed pills. D–42, p. 16.

61. DOCS' policy also provides for contact investigations when an active case of disease is discovered. Close contacts of the infectious individual are screened for TB infection, and a follow-up test 10–12 weeks later is performed if the first test is negative. Further evaluation or an expanded investigation is conducted where appropriate. D–42, p. 13–15.

62. Each facility has a nurse responsible for coordinating TB control. Mary Anne Pike, RN, testified that she maintains a list of all inmates at Woodbourne who need PPD tests and reviews this list monthly. The results of the test are entered in the inmate's chart as well as in the medical unit's computer. Tr.1953 (Pike Stip.).

63. Robert Fiore, the Infection Control Nurse responsible for Woodbourne, provides training to Woodbourne staff in the area of TB and other diseases, and assists in contact tracings. He prepares a monthly report for the DOCS central office regarding the number of active and suspect cases in the facilities for which he is responsible, the number of chart audits he has performed, and the training he has provided to staff and the training he has attended. Tr. 1565–66 (Fiore).

64. TB conversions are down, and there has been a 66% decrease in the TB case rate diagnosed within DOCS facilities since 1992. The number of cases diagnosed through sputum cultures has decreased 80%, and those diagnosed with sputum smears has decreased 90%. In other words, more cases are being diagnosed via the clinical system, before they have enough bacteria in their sputum to show up on a culture or smear. Tr. 1440–41 (Wright).

65. There have been no cases of active, contagious TB from a positive PPD reading at Woodbourne since prior to the implementation of double-ceiling. Tr. 1134 (Wright), Tr. 1569–70 (Fiore). There have been approximately twelve suspect cases since 1994. Those individuals were removed from the general population and isolated while the appropriate tests were performed. In each case, TB was ruled out as the cause of their symptoms. Tr. 1569–70 (Fiore).

66. This Court credits the opinion of Dr. Lester Wright, DOCS' Associate Commissioner and Chief Medical Officer, that double-ceiling has not presented a problem with respect to controlling TB. He explained that there is a heightened risk of spreading TB by confinement of inmates in a small space for 11 hours or more a day, only if one of the two inmates is spreading the bacteria. Tr. 1437 (Wright). The system is designed to catch TB in all inmates, not just those who are double-celled. Tr. 1437 (Wright).

67. DOCS does not mandate an additional PPD test just prior to placing an inmate in a double cell. Tr. 1445 (Wright). This Court also credits the opinion of Dr. Wright that additional screening is not necessary. Tr. 1446–47 (Wright).

68. DOCS has a program to educate inmates about HIV and AIDS and prevention of the disease in which they teach inmates how HIV is spread and attempt to correct misinformation. For example, DOCS has made efforts to make inmates aware that HIV is not spread through casual contact such as sharing a toilet or a drinking fountain with an infected individual. On the other hand, DOCS' training stresses taking precautions against contact with bodily fluids which do spread the infection, such as blood and semen. Tr. 1454–55 (Wright).

69. Dr. Wright testified that it would not be appropriate to have a blanket exclusion of all HIV positive inmates from double-ceiling. First, it could send a message that one's cellmate was not infected, and that it was therefore safe to engage in high risk behavior. Second, it would contradict the teaching that HIV is not transmitted through casual contact, thereby fostering fear and discrimination. Finally, it could identify those inmates with HIV because others in the institution would conclude that an inmate was probably excluded because he has HIV. This could put those inmates with HIV or AIDS at risk of discrimination and could impede DOCS' efforts to have inmates agree to voluntary testing, because they would not want their HIV status known. Tr. 1455–56 (Wright).

70. Dr. Wright further testified that not all HIV infected individuals are at increased risk of acquiring diseases from those around them. This occurs only as the disease progresses and their immune system becomes compromised. Tr. 1466 (Wright). Inmates who are HIV positive and have symptoms are evaluated and depending on what stage of AIDS that inmate has, he may not be housed in a double cell. Tr. 1118–19 (Williams). They would likely be excluded if they had a skin rash, opportunistic infection, or a severely compromised immune system. Tr. 1453 (Wright).

71. DOCS' guidelines provide that inmates with a chronic debilitating disease, skin lesions or open sores, Stage 4 cardiac disease, or who are over 6'5" tall or over 350 pounds will not be placed in a double cell. Those with severe asthma and cardiac disease in stages 1, 2 or 3 will only be housed in a lower bunk with a non-smoker. Elderly or debilitated inmates as well as those inmates with conditions such as seizure disorder, severe arthritis, surgery, injury or deformity involving the back, leg or arm, or hernias, are housed only on a lower bunk if they are in a double cell. Exs. D–36, D–67. These guidelines are not exhaustive. Instead, the medical staff assesses the overall condition of the inmate and makes a determination regarding appropriate housing. Tr. 1141 (Williams), Tr. 1535 (Macram), Tr. 1528 (Sweeney).

72. If an inmate needs a specific type of housing, the nurse who is screening the inmate may immediately call the housing officer to alert him to that fact. Tr. 1520–22, 1525 (Sweeney). A medical permit will be issued specifying the particular housing need, such as a single cell, a cell with a non-smoker, a lower bunk, or a cell on the first floor. While a nurse may make a recommendation, a physician must review the case and sign the permit before it is valid. Tr. 1129–31 (Williams), Tr. 1524 (Sweeney), Tr. 1538–39 (Macram). The medical permit is then sent to the captain. Tr. 1132 (Williams).

73. Out of approximately 1,000 inmates at Woodbourne, 300 have been issued medical permits. Tr. 1131 (Williams). Approximately 75 percent of those permits concern housing location. Tr. 1539–40 (Macram).

### Testimony of Plaintiffs

#### Jerome Waldo

74. Jerome Waldo entered the DOCS system through Downstate Correctional Facility on March 29, 1994. At Downstate he was seen and interviewed by a nurse and filled out a medical screening form on which his only indicated medical problem was scoliosis. Tr. 236–37. Waldo arrived at Woodbourne for the first time in January 1995 and stayed there for approximately one year and a half. He was then transferred to Walkill Correctional Facility and then back to Woodbourne. Tr. 134–35.

75. Waldo was incarcerated for criminal sale of a controlled substance. Tr. 135.

76. Waldo was interviewed by a sergeant when he first arrived at Woodbourne. He was asked whether he had any mental health problems and whether he had any enemies at Woodbourne. Tr. 137–38. He was also given the Woodbourne inmate handbook at that time. Tr. 241.

77. Waldo was also interviewed by medical personnel when he first arrived at Woodbourne and was asked about medical and mental health problems. Waldo told them that he had back problems, was allergic to fish, and was "stressed." Tr. 139–40, 237–38. He also told them that his back was not bothering him at that time and that he was taking medication for it. Tr. 243. Between the time he arrived in January 1995 and April 18, 1995, when he first went into a double cell, Waldo was seen by medical personnel approximately twenty times. Tr. 239.

78. Waldo was double-celled for two and a half months, in two different cells. Tr. 141.

79. Waldo had problems with the top bunk in his first double cell because the springs affected his back condition. The top bunk did not have a board on it. Tr. 144. After approaching a sergeant and explaining his back problems, Waldo was able to move out of his first double cell into the bottom bunk of another double cell. Tr. 148.

80. Waldo testified that he spent approximately thirteen hours a day in his double

cell. Tr. 219. When he was not in his cell, he attended education courses, vocational programs, and meetings of inmate organizations. Tr. 258–59.

81. Waldo had approximately six cellmates at Woodbourne. Tr. 219. Waldo did not get along with one of his cellmates who did not speak English. Tr. 220–22. When his cellmates provoked him, Waldo would "act like a pain in the butt" to make them want to move out. Tr. 256. Each of Waldo's cellmates asked the correction officer to be moved and their requests were granted.

82. Waldo testified that the toilet is three or four inches from the bottom bunk. This was a problem because water splashed the bed whenever the toilet was flushed. Tr. 230–31. However, Waldo's bed was set up so his head was against the wall near the window, not next to the toilet. Tr. 296.

83. Waldo feared that he would be attacked by his cellmates. Tr. 233–34. He also believed that double-ceiling hindered his rehabilitation process because he no longer trusts people. Tr. 234–35.

84. Waldo took showers almost every day while at Woodbourne. Tr. 295. The showers in the gym were available for his use. Tr. 295.

### *Nashawin Bolton*

85. Nashawin Bolton was first taken into State custody on April 4, 1993, and was sent to Ulster Correctional Facility. He spent approximately one week at Ulster, during which time he was seen by a counselor and asked about medical and psychological problems and whether he had any enemies in the state prison system. He also saw a nurse who took blood and gave him a PPD test and several immunizations. Tr. 804.

86. Bolton arrived at Woodbourne in April of 1995 and remained there until February of 1996. Tr. 790.

87. When he arrived at Woodbourne, he was interviewed by a nurse who asked him if he had any physical health problems. He told her that he did not have any medical problems. Tr. 790,804.

88. When Bolton arrived at Woodbourne he was housed in a double cell, where he remained for approximately two months, until he moved into a dormitory. Tr. 791.

89. Bolton's only cellmate was plaintiff Dwight Clark. Tr. 805. Bolton testified that he did not get along with Clark. They had discrepancies over ventilation, smoking habits, and bathroom usage. These discrepancies resulted in verbal arguments. Tr. 792. Bolton stated that there were times that he felt the conflict might lead to violence, but did not testify to any physical altercation with his cellmate. Tr. 792. Even though he and Clark had arguments, Bolton handled the problem "as maturely as possible." Tr. 812.

90. Bolton testified that he spent twelve to fourteen hours a day in a double cell. Tr. 793. Bolton was on the basketball team, participated in inmate organizations such as the NAACP, taught a black cultural awareness class, and tutored inmates who were studying for the G.E.D. Tr. 806–07.

91. Bolton first complained of being in a double cell his first day at Woodbourne, and filled out a form to be moved into a dormitory. Tr. 793.

92. Bolton described his double cell conditions as "small" and "extremely closed in," with "barely room for the two of us to walk" or store personal property. He also found the ventilation to be inadequate. Tr. 794.

93. Bolton took a shower almost every day. Tr. 811.

94. Bolton's double cell had only one window that only opened approximately four inches. He and his cellmate, Dwight Clark, had conflicts over whether the window should remain open or closed. Tr. 798.

95. Double-ceiling made Bolton feel like he "wanted to seriously hurt" his cellmate over things that might seem inconsequential to others, but were important to him and his cellmate, Bolton also feared that his cellmate would do something to him after an argument. Tr. 802. Bolton was never physically attacked by his cellmate, was never the victim of a sexual assault or extortion, and did not catch any diseases from his cellmate. Tr. 819.

*Dwight Clark*

96. Dwight Clark was incarcerated at Woodbourne from December 1993 until February 6, 1996, when he was transferred to Walkill Correctional Facility. Tr. 835.

97. Clarke had been convicted of an attempted armed robbery. Tr. 835.

98. When he arrived at Woodbourne, Clark was asked if he had any enemies there. His medical records were reviewed and he had a physical examination. Clark had the opportunity to raise any medical problems. Tr. 846–47.

99. Clark was first placed in a double cell in April 1995. He did not discuss being put in a double cell with the captain, but did speak to the housing officer. Tr. 836. The housing officer told him that double-ceiling was normal procedure and if he refused normal procedures, he would be put in isolation. Tr. 836.

100. Clark was not interviewed by any medical personnel in the year before he was placed in a double cell. Tr. 836.

101. Clark was told that the normal time to be in a double cell was sixty days, but he spent 110 days in a double cell without volunteering to do so. Tr. 837.

102. Clark knew that in order to request different types of housing, he had to fill out a housing change request form. Tr. 847–48. After being placed in a double cell, Clark chose to remain there until a single cell was available, rather than move to a dorm. He knew he could have moved to a dormitory if he chose to do so. Tr. 848–49.

103. Clark had three different cellmates. Tr. 837. His first cellmate was plaintiff Nashawin Bolton, with whom he shared a cell from April 11, 1995 until May 24, 1995. Tr. 852.

104. Clark had a confrontation with his third cellmate over usage of the sink, including a push by Clark, shouting and verbal threats. Tr. 838.

105. When Clark and Bolton celled together they both were out of their cell a lot because of all of the activities they were involved in. Tr. 860. Clark was very involved in athletics at Woodbourne and also spent a great deal of time in the library. Tr. 855–57.

106. Clark felt double-ceiling impacted on his health and safety because he had two different confrontations with his cellmates and he "didn't know how long they would hold a grudge, what sort of animosity they were going to take out then on [him]." He had a hard time sleeping at night because of fear of being attacked by his cellmate. Tr. 842–43.

107. Clark had one confrontation with his first cellmate, plaintiff Bolton. Clark testified that he wanted to keep the window open to get ventilation and on one occasion, Bolton closed the window while Clark was out of the cell, and when Clark returned, they "had a little spat," which was "totally verbal." Tr. 843–44.

### *Non–Plaintiff Inmate Witnesses*

108. Testimony was received from nine non-plaintiff initiates.

109. Six inmate witnesses testified that upon reception into the DOCS system at a reception facility, they underwent a classification and screening that included, among other things, a medical examination and interview concerning enemies in DOCS. Tr. 103–04 (Matiash), Tr. 190 (Harder), Tr. 266–67 (Robinson), Tr. 312 (Dennis), Tr. 824 (Brandon), and Tr. 878–79 (Ewing).

110. Three inmate witnesses testified that they were aware that they could speak to an officer if they felt they were in danger and could ask to be placed in protective custody. Tr. 103 (Matiash), Tr. 190–91 (Harder), Tr. 312–13 (Dennis).

111. Four inmate witnesses testified that shortly after arriving at Woodbourne, they were interviewed by either a sergeant, lieutenant or captain. The interview included, among other things, questions about known enemies in the system, physical problems, and mental health problems. Tr. 164 (Harder), Tr. 313–14 (Dennis), Tr. 350, 370 (Nicholas) and Tr. 879 (Ewing).

112. Six inmate witnesses testified that on the day they arrived at Woodbourne, or shortly thereafter, they were seen by medical personnel. Tr. 80, 105 (Matiash), Tr. 165,

194 (Harder), Tr. 264, 269–70 (Robinson), Tr. 314–15 (Dennis), Tr. 350, 370 (Nicholas), and Tr. 879 (Ewing).

113. Six inmates testified that they were aware of the ability to request different types of housing by either filling out a housing request form or by speaking to DOCS personnel. Tr. 213 (Harder), Tr. 278 (Robinson), Tr. 333 (Dennis), Tr. 373 (Nicholas), Tr. 830 (Brandon), Tr. 879–80 (Ewing).

114. Daniel Harder testified about complaints he made concerning a cellmate who, because of Vietnam flashbacks, jumped on him in his bed in the middle of the night on two occasions. Tr. 174–75. He did not report the first or second incident, but his request to move was granted in three days. Tr. 202–03.

115. Christopher Ewing testified about a verbal conflict that he had with his cellmate. Tr. 870. The guard on duty spoke with him and the following morning the cellmate was moved to another cell. Tr. 871.

116. Three inmates testified that they were injured in a double cell. William Matiash testified that he was injured when he fell out of a top bunk. Tr. 89. Basil Dennis testified that he hit his head on the top bunk by sitting up in the bottom bunk. Tr. 308. Steven Bass testified that while climbing into his bunk, he lost his balance and fell. Tr. 787–88.

117. The bulk of the claims by inmates relating to health and safety were that they had to use the toilet in front of their cellmates. Tr. 365–366 (Nicholas); Tr. 339–40 (Dennis), Some inmates found their cellmates to be unclean (Tr. 265 (Robinson)), were afraid of fires (Tr. 368–69 (Nicholas); Tr. 877 (Ewing)), were afraid because they did not know if their cellmates had any diseases (Tr. 188–89 (Harder); Tr. 877 (Ewing)), did not know the crime for which his cellmate was incarcerated (Tr. 311 (Dennis)) and did not like the fact that their cellmates smoked (Tr. 97 (Matiash); Tr. 356 (Nicholas)).

118. None of the inmate witnesses testified about a risk of harm to the three plaintiffs or injuries sustained by the three plaintiffs.

*Cleanliness*

119. Aside from messiness within the cells due to cellmates hanging their clothes, and possibly water splashing from a toilet, plaintiffs presented no credible evidence of problems with cleanliness within the cells at Woodbourne. Tr. 230–31 (Waldo); Tr. 1603–05 (O'Connor); D–159; D–160; D–161.

*Fire & Safety*

120. There was no credible evidence that the double cells created a fire hazard.

*Expert Testimony*

121. Plaintiffs offered the testimony of two experts, Ward C. Duel and Steven J. Martin. Duel, a registered sanitarian with more than 30 years experience in environmental and public health areas, testified as an expert in the field of prison conditions and the impact of environmental conditions on the health and well-being of inmates in correctional institutions. Tr. at 414–15; P–74 at Appendix. Duel is currently a member of ACA, the American Jail Association, the American Society of Heating Refrigerating and Air–Conditioning Engineers ("ASHRAE"), the National Environmental of Health Association and a fellow of the American Public Health Association ("APHA"). Tr. at 407. Duel described and evaluated the conditions of the double-cells in each of the four cellblocks at Woodbourne that contain double-cells as they existed on February 8 and 9, 1996. P–74 at 1.

122. Martin testified regarding the administration of correctional facilities, including classification and housing practices. Tr. at 1192. Martin has more than 25 years experience in the field of corrections and in evaluating correctional facilities. Tr. at 1185–92; P–75A. In the course of his analysis, Martin reviewed Woodbourne's files and deposition testimony and interviewed staff and inmates. Tr. at 1193–94; P–75.

123. Defendants offered the testimony of two experts, James Bailey, for Sigal Environmental, Inc., and Michael Quinlan. Quinlan was the former Director of the United States Bureau of Prisons in the Department of Justice ("BOP"). After leaving the Bureau of Prisons, Quinlan became a consultant to various organizations, including the U.S. Sen-

tencing Commission, a corrections newsletter and a private prison company. He has also provided consulting services to the Governors of Oklahoma and Ohio. Tr. 1810, 1813. In 1980–1985, he was Superintendent of the federal prison in Otisville, New York, where he implemented double-celling. Tr. 1808–1809, 1815.

124. Sigal Environmental was retained by defendants to evaluate ventilation and indoor air quality in cell blocks at Woodbourne, including an evaluation of contaminants and disease. Sigal provided the services of James Bailey, a mechanical engineer, and Edward Light, a certified industrial hygienist. Tr. 1623–1624, 1626–1628 (Bailey).

*"Contemporary Standards of Decency"*

125. Various witnesses, including experts, addressed the issue of how contemporary standards of decency are ascertained. In Michael Quinlan's opinion, contemporary standards of decency are based on the policies and procedures of most state correctional agencies, by judicial oversight and legislatures, as well as by public opinion. Tr. 1833–34 (Quinlan).

126. Duel suggested basing those standards on the standards proposed by ACA, ASHRAE, and APHA. Tr. 427–29, 431–32 (Duel).

*American Correctional Association ("ACA")*

127. The purpose of ACA is "to promote improvement in the management of correctional agencies through the administration of a voluntary accreditation program and the ongoing development and revision of relevant, useful standards." P–173(A) at vii.

128. Thirty-nine of its standards are "mandatory;" they are required to be met for prison accreditation, and 441 other standards are "non-mandatory." P–173(A) at vi; D–260; Tr. 422–23, 553 (Duel). Accreditation requires a facility to comply with 100% of the mandatory standards and 90% of the non-mandatory standards. P–173(A) at x; Tr. 423–26 (Duel).

129. ACA standards are a guide to correctional administrators. The standards are mandatory only if a facility decides to become a part of the ACA accreditation process. Only 30% of the adult correctional institutions in the United States have been accredited. The rest are not necessarily deficient institutions—they have not chosen to participate in the ACA voluntary compliance program. Tr. 1830–31 (Quinlan).

130. ACA's "mandatory" standards are ones that relate to an immediate threat of injury or serious disease. Tr. 422 (Duel).

*American Society of Heating, Refrigeration and Air Conditioning Engineers ("ASHRAE")*

131. The goal and purpose of ASHRAE standard 62–1989 is "to specify minimum ventilation rates and indoor air quality that will be acceptable to human occupants," and is "intended to avoid adverse health effects." P–309 at 1.

132. The ASHRAE guideline for ventilation in prison cells is 20 cubic feet per minute. Tr. 1638–39 (Bailey).

133. The ASHRAE standard is not applicable to buildings that were built before the ASHRAE standards were promulgated. Tr. 1673 (Bailey).

*American Public Health Association ("APHA")*

134. APHA is a general umbrella organization in the field of public health. It promulgates environmental and health standards for correctional facilities. Tr. at 408–09, 431–32 (Duel).

135. APHA has published the following standards that are relevant to the issues in this action: the standard set by APHA for adequate space in a prison cell is a minimum of 60 square feet of total floor space per occupant for a total minimum double-cell size of 120 square feet. P–323A at 86–87; Tr. at 473 (Duel). The standard set by APHA for lighting in prison cells is 30 foot-candles of light. P–323A at 71; Tr. at 468–71 (Duel). The standard set by APHA for water temperature in inmate showers and hand washing stations is 105°F to 120°F. P–323A at 72; Tr. at 491–92 (Duel). APHA also requires a ratio of one shower for every eight inmates. P–323A at 86; Tr. at 501 (Duel).

*Ventilation*

136. The evidence did not support plaintiffs' contention that the ventilation throughout the cells at Woodbourne is inadequate and thereby subjects them to risks of contracting airborne diseases such as TB.

137. The primary source of ventilation in the cellblocks is natural ventilation from the windows in each cell. Tr. 1743–44 (Miller). The cell windows in Woodbourne exceed the minimum required by State Building Code, 4% of gross floor area. The windows in A and B Blocks are 8.8% of the floor area and 7.0% of the floor area in C and D Blocks. Tr. 1713–15 (Rupert); 9 N.Y.C.R.R. §§ 763.1(c), 763.3(b).

138. The cells in C and D blocks contain exhaust vents that are operated by a roof-mounted mechanical exhaust fan. The fans run continuously for three quarters of the year and intermittently during the winter months. Tr. 1712 (Rupert); Tr. 452, 455–56 (Duel). The mechanical ventilation in A and B Blocks consists of 2–speed fans located at the ends of the corridors. The fans are used as a smoke purge in the event of an emergency, and also to provide additional ventilation on a continuous basis during three-quarters of the year, and on an intermittent basis during the winter. Tr. 1712 (Rupert). Woodbourne is now designing a mechanical system to ventilate all its cell blocks and dormitories. Tr. 1722–23 (Rupert).

139. This Court credits the testimony of Bailey that the natural ventilation and the lack of recirculated air is adequate and has advantages in terms of contaminant control. Tr. 1702–03 (Bailey); *see also* Tr. 1713 (Rupert).

140. Although the ventilation is adequate, it falls below the standards established by ACA and ASHRAE. ACA standard 3–4144 establishes a standard for indoor air quality of 15 cubic feet per minute (cfm) of outside or recirculated filtered air per occupant. P–173(A) at 48. ASHRAE has two methods for assessing ventilation. The first measures the amount of outside air per occupant and requires a minimum ventilation rate of 20 cfm in prisons. The second measures the level of certain contaminants in the air. ASHRAE 62–1989, §§ 4, 4.2, 6, 6.2, Table 2, P–309, at 5, 7–11; Tr. 432, 503–505 (Duel). Under the second approach, a determination is made whether the concentration of certain contaminants—such as carbon dioxide—is above contaminant concentration guidelines. ASHRAE 62–1989, Tables 1, 3, P–309, at 7, 14. ASHRAE specifies that "[a] limit of 1000 ppm [parts per million] $CO_2$ is recommended to satisfy comfort (odor) criteria." This carbon dioxide standard is not for safe levels of carbon dioxide concentration, which must be much higher before there is any health effect. Dangerous levels range from at least 5000 ppm for exposure over a full workweek (although healthy people can live adequately at higher levels for extended periods) to 30,-000 ppm for a few minutes. Tr. 1644, 1651–52 (Bailey); Tr. 616 (Duel).

141. Bailey and Light did an evaluation of Woodbourne in terms of contaminants and indoor air quality, including an introduced tracer gas decay test, measurement of air flow rate of mechanical exhaust systems, smoke tube tests, and measurements of extant carbon dioxide in cells. Tr. 1631–32, 1634–35 (Bailey); D–79.

142. Only two of Bailey and Light's carbon dioxide readings were above 1,000 ppm. One was in a single cell (1,022 ppm) and one was in a double cell (1,091 ppm). Tr. 1634–1636 (Bailey); D–79.

143. Duel measured carbon dioxide levels of up to 1500 and 1450 parts per million in two B block cells, one with a closed window and open door, and in one with the door slightly open. Tr. 525 (Duel); P–420. He testified that in C and D block cells, which have registers, he measured carbon dioxide levels of 1200 parts per million in cell D–2–28 and a register exhaust rate of 40 cubic feet per minute, and 2000 parts per million in cell C–3–2 where the register was blocked by lint. Tr. 526–527 (Duel); P–420.

144. Even though the measurements of carbon dioxide by plaintiffs' expert and defendants' expert differed, even the higher levels of carbon dioxide reported by plaintiffs' expert do not present health concerns. P–309, § 6.2.1; D–79 at 1, 3.

145. Calculating from its tracer gas decay test results, Sigal Environmental found 2.0 air changes per hour in cellblock B and 2.17 air changes per hour in cellblock D. Tr. 1631–34 (Bailey); D–79; D–242. Sigal did not make a similar evaluation within a particular double cell.

146. Sigal concluded from the tracer gas decay results that the combined natural and mechanical ventilation rates are "quite good." Tr. 1638 (Bailey).

147. Temperatures at Woodbourne were within the comfort range established by ASHRAE. Tr. 1652 (Bailey); D–79 at 2.

*Cell Space*

148. The current ACA standard for cell space applicable to a double cell, standard # 3–4128–1, § 1 (2–50 occupants), was added in the January 1994 Supplement. P–173(B) at 69; P–173(C) at 84. It is a non-mandatory standard. P–173(A) at vi; Tr. 433–434 (Duel). It requires a minimum of 25 square feet of unencumbered space for each occupant in a cell. Tr. 433 (Duel); P–173(B) at 69, P–173(C) at 84. "Unencumbered space" is defined as "usable space that is not encumbered by furnishings or fixtures." ACA standard # 3–4128–1, note; P–173(B) at 69, P–173(C) at 84.

149. ACA standard # 3–4128–1 also provides that "[a]t least one dimension of the unencumbered space is no less than seven feet." P–173(B) at 69, P–173(C) at 84.

150. ACA standard # 3–4128–1 provides, in § 2, that, "[w]hen confinement exceeds 10 hours per day, there is at least 80 square feet of total floor space per occupant." P–173(B) at 69, P–173(C) at 84; Tr. 441 (Duel). ACA has no total floor space standard if confinement is for 10 hours per day or less. Tr. 560 (Duel).

151. There is no special significance to ACA's use of a ten-hour threshold, and ACA cell size standards do not take into account the actual time an inmate spends in programs or the variety and quality of programs available. ACA has the same standard for any prison cell whether inmates are in it for six hours or for ten hours, and the same standard whether inmates are in the cell for ten hours and five minutes or for twenty three hours. Tr. 564 (Duel).

152. The total floor space in the double cells in A and B block and C and D block is 58.6 square feet and 53.3 square feet, respectively. Tr. 445–47 (Duel).

153. Duel calculated that the floor space in the double cells did not meet the ACA standards for unencumbered floor space per inmate and, if the inmate is confined over 10 hours a day, for total floor space, or the APHA standard for total floor space. Tr. 447–49 (Duel).

154. The double cells comply with that part of the ACA cell space standard that requires one dimension of the cell to be at least seven feet. Tr. 572 (Duel).

155. Inadequate cell space by itself does not constitute an unreasonable risk of injury and illness. *See* Tr. 433, 435 (Duel).

156. Double-celling does not by itself result in increased levels of violence or risk to safety, or in a health hazard. These levels do not change when the institution provides services needed for the additional double celled inmates without substantial delays. Tr. 1819–22, 1834 (Quinlan); D–82 at 5.

*Lighting*

157. ACA has a non-mandatory standard for lighting in prison cells, standard # 3–4139, of 20 foot-candles at desk level and in personal grooming areas. Tr. 462–63 (Duel); P–173(A) at 47.

158. APHA does not have a lighting standard specifically designed for cells. It has a standard of 30 foot-candles for lighting in living areas and reading rooms. It has a lower standard, 20 foot-candles, for toilets and washrooms. P–323 at 71; Tr. 468, 473 (Duel).

159. The lighting in the double cells did not meet the ACA standard # 3–1439 of 20 foot candles in areas used for personal hygiene and reading in bed. Tr. 476–77 (Duel). Inmates, however, can purchase a clip-on lamp which can provide sufficient lighting in the lower bunk, where the lighting level is low. Tr. 608 (Duel); Tr. 1758 (Miller).

160. In converting the 56 cells to double cells, the overhead light was moved from the

center of the ceiling to the side to increase the lighting over the bunk beds. Tr. 1758 (Miller).

161. There was no evidence that the light level in areas used for personal hygiene was significantly different in double cells than in single cells. There was no evidence of plaintiffs or any inmate in a double cell being unable to take care of his personal hygiene or to read because of inadequate lighting.

162. Rupert considers the lighting in the single and double cells adequate. He wrote and read notes in the cells, in the rear, in the middle, by the toilet, by the mirror, by the door. Tr. 1718–19 (Rupert).

163. There was no evidence of any plaintiff or any inmate suffering eye strain or headaches due to inadequate lighting in a double cell.

### Hot Water and Showers

164. ACA has two standards relating to showers for inmates. ACA standard # 3–4134, as well as the APHA standard, sets out a ratio of eight inmates to one shower, with shower water temperatures of 100 to 120 degrees. Tr. 490, 499–501 (Duel); P–173(C), at 85. ACA standard # 3–4322 requires sufficient facilities to allow inmates to shower at least three times a week. The ACA comment recognizes that providing an opportunity for daily showers is ideal. P–173(A) at 107; Tr. 571–72 (Duel).

165. Woodbourne's inmate to shower ratios were as follows: 20 and 19 inmates to 1 shower on ground floors of A and B, and 14 inmates per shower on upper floors; 11 inmates per shower in C and D Blocks. Tr. 498–99 (Duel). Although the shower ratios fall below the ACA and APHA standards, Woodbourne offers daily showers to all inmates, and thus meets the standard for ideal hygiene according to the ACA. Tr. 1290 (Martin); P–173(A); Tr. 572 (Duel). In addition, there was no evidence that the showers to inmate ratios presented any risk of disease or harm to the inmates.

### Sewer Gas

166. This Court does not credit Duel's speculation that small holes drilled into the pipes in the chases in C and D blocks may result in the escape of sewer gas. Tr. 488 (Duel). Duel did not test for the presence of sewer gas or aerosolized bacteria, and did not smell sewer gas. Tr. 489–90 (Duel). He acknowledged that closing the hole would take care of his concern. Tr. 607 (Duel). There was evidence that the holes which gave rise to Duel's concern about sewer gas had been covered. Tr. 1653–54 (Bailey).

### Heat Pipes

167. This Court does not find credible the testimony that there is a substantial risk of accidental burns from uncovered vertical heating pipes in the cells. Tr. 478–79 (Duel). Based on the configurations of cells, it would be difficult and unlikely for an inmate dismounting from an upper bunk in a double cell to inadvertently be burned by the heating pipes. See Tr. 480–81.

### Unusual Incidents

168. Deputy Superintendent Miller testified that in the more than two years since the institution of double-celling, he knows of only two reported physical altercations between cellmates in a double cell. Tr. 1764 (Miller). The first occurred in December of 1996, during which an argument grew into a physical altercation. An officer ordered the inmates to stop fighting, and they did so. Tr. 1763 (Miller).

169. The second incident allegedly occurred in January of 1997. At approximately 10 p.m. an inmate reported that he and his cellmate had a fight six hours earlier. The inmates were taken to the medical unit and examined, and no injuries or evidence of a physical altercation was found. Due to lack of injuries and the fact that staff did not hear anything at the time the incident occurred, Deputy Supt. Miller had reason to doubt whether the fight transpired. Tr. 1763–64 (Miller).

170. The Unusual Incident Reporting System is an automated system in which events or incidents that occur in prisons are entered into a computerized system for tracking, monitoring and reporting purposes. T. 1877 (Lyons). DOCS has 22 categories of unusual incidents ("UI's"), including accidents, inmate assaults on inmates, inmate assaults on staff, contraband, deaths, disrup-

tive behavior, mass demonstrations, inmate disturbances, sexual misconduct and employee misconduct. Tr. 1877 (Lyons).

171. Plaintiffs contend that the increase in the number of UI's after double-celling was implemented in 1995 demonstrates that double-celling has led to increased violence among inmates, thereby increasing the risk of harm to inmates. Although the statistics do demonstrate an increase in UI's in the year after double-celling was implemented at Woodbourne, this Court does not find persuasive plaintiffs' inference that this is solely attributable to double-celling. The statistics also demonstrate that the number of UI's has recently decreased, and there is little evidence to corroborate plaintiffs' inference that double-celling has placed inmates at substantial risk of physical harm.

172. In 1986, Woodbourne experienced a similar number and rate of UI's as in four other medium A facilities—Collins Correctional Facility, Mid-state Correctional Facility, Orleans Correctional Facility and Wyoming Correctional Facility—where inmates are not double-celled. Tr. 1894 (Lyons). Subsequently, Woodbourne experienced a downward trend while the numbers of UI's increased at the other facilities. Tr. 1895 (Lyons); D–66.

173. UI's at Woodbourne increased from 1994 to 1995, when double-celling was implemented, but then declined from 1995 to 1996. The other four facilities also showed an increase from 1994–95, and three of them experienced increases in 1996. Tr. 1896 (Lyons); D–66.

174. In 1986, Woodbourne had the highest rate of inmate upon inmate assault of the four comparable facilities. Over time, it has decreased, while four comparable facilities went up. In 1995, when Woodbourne's rate increased, the rates at the other facilities did so as well. Tr. 1896–97 (Lyons).

175. At Woodbourne, the inmate assault upon staff rate declined considerably between the years 1990 and 1996. Tr.1902 (Lyons).

176. From April 1, 1995 through the end of 1996, only three Use of Force reports were filed on inmates at Woodbourne who were then housed in double cells. Many inmates involved in unusual incidents were housed in the double cells, but none of these incidents occurred in double cells, but rather occurred in the school, shop or on the way to the dining hall. Tr.1904 (Lyons).

177. Deputy Supt. Miller testified that the following factors may account for an increase in unusual incidents and use of force in 1995 at Woodbourne: implementation of double-celling, an upsurge in gang activity and a change in the type of inmate sent to Woodbourne in terms of the length of time before they were eligible to appear before the parole board. Tr. 1780 (Miller). He acknowledged that any change, such as double-celling, will create "a bubble of activity," but explained that as the novelty wore off people adjusted to the change. Tr. 1780–81 (Miller). From his current perspective, Deputy Supt. Miller testified that double-celling did not significantly interfere with the ability to maintain discipline and "has not had a negative impact at all on the operation of the facility." Tr. 1780–81 (Miller).

178. There was no evidence to support plaintiffs' theory that defendants had under reported the number of UI's in 1996.

### III. Conclusions of Law

179. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

180. Venue is proper in this judicial district in accordance with 28 U.S.C. § 1391(b)(1) and (2).

### Exhaustion of Administrative Remedies

181. Plaintiffs were not required to exhaust their administrative remedies prior to filing the complaint in this action on May 24, 1995. Defendants' contention that plaintiffs were required to exhaust their administrative remedies under the Prison Litigation Reform Act's ("PLRA") amendments to 42 U.S.C.A. § 1997e(a) (West Supp.1997), passed by Congress eleven months after plaintiffs filed their complaint, lacks merit. This aspect of the PLRA cannot be applied retroactively.

182. The Second Circuit has not yet ruled on whether the PLRA's exhaustion require-

ment is retroactive. The Second Circuit has analyzed the issue of whether other provisions of the PLRA are retroactive. *See Covino v. Reopel,* 89 F.3d 105, 108 (2d Cir.1996) (holding that new fee requirements of the PLRA applied to prisoners who filed their notice of appeal prior to the act's enactment); *Ramsey v. Coughlin,* 94 F.3d 71, 73 (2d Cir.1996) (holding that new fee requirements of the PLRA would not be applied retroactively where, quoting *Covino,* the " 'appeal reached the stage where judicial resources had already been expended' " because appeal had been fully briefed and submitted for decision before PLRA became effective); *Duamutef v. O'Keefe,* 98 F.3d 22, 24 (2d Cir.1996) (refusing to apply PLRA's fee requirements where appeal fully briefed before *Covino* decision rendered).

183. The Sixth Circuit has held that the PLRA's exhaustion requirement is not retroactive. *See Wright v. Morris,* 111 F.3d 414, 423 (6th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997); *Malone v. Godinez,* 1997 WL 222945, at *2 (N.D.Ill. April 30, 1997); *Gordon v. Sheahan,* 1997 WL 136699, at *4 n. 2 (N.D.Ill. March 24, 1997).

■ 184. Absent clear Congressional intent, retroactivity is "presumptively prohibited ... where the new provision 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.' " *Covino,* 89 F.3d at 107 (quoting *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994)). Congress has not evidenced any intent to apply Section 1997e(a) retroactively. *See Wright,* 111 F.3d at 418. The PLRA amended that section to read, *"no action shall be brought* with respect to prison conditions under section 1979 of the Revised Statutes of the United States [42 U.S.C. § 1983], or any other Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a) (West Supp.1997) (emphasis added). The plain language of the "statute ex-

pressly governs the bringing of new actions, not the disposition of pending cases." *Wright,* 111 F.3d at 418. Furthermore, applying that section retroactively would impermissibly impair plaintiffs' rights and impose new duties upon plaintiffs. Accordingly, this Court holds that the PLRA's exhaustion requirements do not apply retroactively.

### Physical Injury Requirement

■ 185. Defendants claim that plaintiffs lack standing because they have not proved a physical injury as required by the PLRA's amendments to 42 U.S.C. § 1997e(e) [3]. That claim is meritless. Plaintiffs filed their complaint on May 24, 1995, eleven months before the PLRA was passed. *See Duamutef,* 98 F.3d at 24 (PLRA was signed into law on April 26, 1996).

186. The PLRA's physical injury requirements cannot be applied retroactively to plaintiffs. *See Harris v. Lord,* 957 F.Supp. 471, 474 (S.D.N.Y.1997) (§ 1997e(e) does not apply retroactively); *Heisler v. Kralik,* 981 F.Supp. 830, 837 n. 3 (S.D.N.Y.1997).

187. As noted above, retroactivity is "presumptively prohibited ... where the new provision 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.' " *Covino,* 89 F.3d at 107 (quoting *Landgraf,* 511 U.S. at 280–81, 114 S.Ct. at 1505). Prior to the PLRA, mental and emotional stress resulting from a constitutional violation was compensable under 42 U.S.C. § 1983. *See Carey v. Piphus,* 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978). Forcing plaintiffs to submit to the PLRA's physical injury requirement would impermissibly attach "new legal consequences to the events completed before the enactment of the PLRA," by denying plaintiffs "a cause of action where [they] once had a legally cognizable claim." *Harris,* 957 F.Supp. at 474 (internal quotations omitted). Because applying Section 1997e(e) " 'would impair rights [plaintiffs] possessed when [they] acted,' this section of the PLRA does

---

**3.** 42 U.S.C. § 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

not apply retroactively[.]" *Harris,* 957 F.Supp. at 474 (quoting *Landgraf,* 511 U.S. at 280–81, 114 S.Ct. at 1505).

### Eighth Amendment

188. The Eighth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment and prohibits the infliction of "cruel and unusual" punishment on those convicted of crimes. *See Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962).

189. The Supreme Court has held that the housing of two inmates in a single cell is not per se cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Conditions of confinement of convicted individuals do not constitute cruel and unusual punishment unless they "involve the wanton and unnecessary infliction of pain" or are "grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* at 347, 101 S.Ct. at 2399. Only conditions which constitute or cause the "serious deprivation of basic human needs," which are the "minimal civilized measure of life's necessities," constitute cruel and unusual punishment. *Id.*

190. Although *Rhodes* may stand for the proposition that double-celling does not amount to a per se Eighth Amendment violation, "implicit in Rhodes [is] that double celling can amount to an Eighth Amendment violation if combined with other adverse conditions." *Nami v. Fauver,* 82 F.3d 63, 67 (3rd Cir.1996).

191. In *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991), the Supreme Court explained that only conditions that result in "the deprivation of a single, identifiable human need such as food, warmth, or exercise ..." violate the Constitution. "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.*

192. In order to establish an Eighth Amendment violation, an inmate must satisfy both an objective and a subjective prong. Plaintiffs must prove that they have been subjected to conditions objectively serious enough to constitute a violation of contemporary standards of decency, i.e. conditions that are considered intolerable by a civilized society. The Eighth Amendment " 'proscribes more than physically barbarous punishments' ... [i]t prohibits penalties that are grossly disproportionate to the offense ... as well as those that transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.' " *Lareau v. Manson,* 651 F.2d 96, 105 (2d Cir.1981) (quoting *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978) (internal quotations and citations omitted)).

193. To satisfy the subjective element, plaintiffs must prove that defendants acted with deliberate indifference. *See Wilson,* 501 U.S. at 303–05, 111 S.Ct. at 2327. A prison official "may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 1984, 128 L.Ed.2d 811 (1994). Even if defendants are actually aware of such a risk, they have not violated the Eighth Amendment if they respond reasonably to such a risk, even if injury is not avoided. *Id.* In other words, prison officials are not guarantors of absolute safety.

194. In assessing a challenge to prison conditions in state correctional facilities, a federal court must also be mindful of the deference case authority requires be given to prison officials. *See Sandin v. Conner,* 515 U.S. 472, 482, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995). Affording deference and flexibility to prison officials is "especially warranted in the fine-tuning of the ordinary incidents of prison life." *Id.*

195. Application of the Eighth Amendment is guided by *contemporary standards of decency.* The opinions of experts and standards established by concerned organizations may be helpful on some questions, but "they simply do not establish the

constitutional minima; rather, they establish goals recommended by the organization in question." *Rhodes*, 452 U.S. at 350, 101 S.Ct. at 2401 (internal quotations omitted). Public attitudes toward a certain punishment, or what society is willing to tolerate in its prisons, is the more appropriate gauge of contemporary standards. *Id.*

196. In this case, the "basic human needs" or "minimal civilized measure of life's necessities" of which plaintiffs claim they have been deprived by double-celling is safety or freedom from violence and protection from disease or threats to their health. Plaintiffs presented no evidence that double-celling caused them to be denied sufficient food, exercise or access to medical care, or put undue strain on the basic facilities and infrastructure of Woodbourne. Thus, the issue before the Court is whether double-celling has caused a sufficiently serious injury to plaintiffs' health and safety, and whether defendants' have been deliberately indifferent to that danger.

### Objectively Serious Injury

197. Plaintiffs have failed to establish a deprivation of basic needs serious enough to meet the objective prong of the Eighth Amendment standard.

198. There was no evidence adduced that plaintiffs were ever denied adequate food, medical care, or clothing.

199. There was some evidence of physical interactions between cellmates. For example, Waldo testified to a "minor" altercation with some "pushing" with his cellmate (Tr. 296), and another inmate described an incident in which his cellmate jumped on top of him during the middle of the night. Tr. 174–75 (Harder). These isolated, de minimis incidents cannot support an Eighth Amendment claim.

200. Plaintiffs failed to establish that inmates at Woodbourne were living in risk of future physical harm arising from violence among double-celled inmates. The overwhelming weight of the evidence was that there was little violence at Woodbourne compared to other medium A facilities. This Court credits the testimony of Deputy Superintendent Miller that the reason for the increase in unusual incident reports in 1995 was due to an increase in gang activity, in addition to the novelty of double-celling, which dissipated in 1996. Tr. 1780–81 (Miller).

201. Plaintiffs claim that a failure to adequately screen cellmates resulted in placing incompatible inmates together, which resulted in arguments and fights. The evidence did not support this. Rather, there was evidence that the minor disputes that did arise between cellmates was handled quickly (in one instance, a cellmate was removed after spending just one night with an incompatible cellmate, *see* Tr. 871–72 (Ewing)) and never rose to the level of physical violence, save for the minor incidents set forth above. *See* Tr. 844 (Clark).

202. Plaintiffs' testimony that they lived in fear of assault from their cellmates is not an objectively serious enough injury to support a claim for damages. *See Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997) (fear of assault was not "the kind of extreme and officially sanctioned psychological harm that [supports] a claim for damages under the Eighth Amendment"). There is no evidence that such fears were well-founded or that plaintiffs' cellmates posed an unreasonable danger to them; the evidence was to the contrary. In addition, the evidence demonstrated that inmates are screened prior to arriving at Woodbourne and that inmates are generally transferred there to reward them for good behavior.

203. A common concern among inmates who testified was having to use the toilet in front of their cellmates. This experience, while undoubtedly embarrassing and uncomfortable, does not approach the standard of inhumane conditions that violate the Eighth Amendment. There was no evidence that the toilets did not function properly or that they were unsanitary.

204. The cells are unquestionably small, and below ACA standards in terms of size, but this alone does not establish an Eighth Amendment violation. Plaintiffs have not proven that the cell size in combination with other factors resulted in the deprivation of any basic human need. Indeed, the majority

of testimony elicited demonstrated that inmates are only required to be in their cells for approximately two waking hours for head counts. Otherwise, inmates may attend a variety of vocational, educational and recreational programs. They have access to the gym, the yard, the library and the housing unit day rooms when they are not attending a specific job or program.

205. Plaintiffs also failed to prove that housing inmates in double cells subjected them to serious risk of harm to their health. There was no evidence that anyone with a serious, communicable disease was housed in a double cell.

206. Plaintiffs placed great emphasis on the risk of contracting TB in a double cell. Yet, there has been no case of active TB at Woodbourne since the implementation of double-celling. Plaintiffs criticize the fact that inmates who test positive for TB infection are not excluded from double cells. This does not present an objectively serious injury to the inmates. *See Karlovetz v. Baker*, 872 F.Supp. 465, 468 (N.D.Ohio 1994). The practice of putting inmates who have serious communicable diseases together is actionable under the Eighth Amendment, *see Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993), but in this case, there was no evidence that inmates with active infectious tuberculosis were housed in double cells.

207. This Court similarly finds that plaintiffs have not been injured by exposure to HIV positive inmates in double cells. HIV is not spread by casual contact such as sharing sinks or toilets. Rather, it is most commonly spread through contact with blood or semen. DOCS educates inmates about the spread of HIV and trains them to take precautions. Tr. 1454–55 (Wright).

208. Defendants elicited at trial credible reasons for not per se excluding HIV positive inmates from double-celling. Plaintiffs failed to demonstrate that simply housing an inmate with a HIV positive cellmate presents a serious injury.

209. Plaintiffs alleged that the ventilation in the cells is poor. However, there is no evidence that the natural ventilation was so inadequate as to cause injury. The Eighth Amendment does not guarantee a certain type of ventilation system or a certain rate of air exchange. Plaintiffs failed to prove that the level of ventilation at Woodbourne deprived them of a basic human need. There was no evidence that the ventilation permitted the spread of airborne disease—particularly TB. Plaintiffs attempted to demonstrate that double-celling increases the risk that inmates will contract TB in the future but the evidence does not support this inference.

210. The duration of double-celling did not present a serious injury or violate constitutional standards of decency. The three plaintiffs were housed in double cells between two to four months each. This period of time does not constitute cruel and unusual punishment, especially in light of the substantial amount of time an inmate spends out of his cell.

211. In sum, this Court does not find that the conditions of ventilation, required time in the cell, lighting, sanitation, or privacy either alone or in combination amount to wanton and unnecessary infliction of pain, or are grossly disproportionate to the severity of the crimes for which the inmates have been imprisoned.

### Deliberate Indifference

212. Plaintiffs have not proven that defendants disregarded any substantial risks of serious harm that arose from the implementation of double-celling at Woodbourne.

213. There was ample evidence regarding the steps that DOCS took to research double-ceiling prior to its implementation at Woodbourne. In addition, the administration at Woodbourne took steps to ensure that double-celling was implemented safely and with a minimum of disruption. Guidelines were formulated regarding which inmates should be excluded from double-celling.

214. Plaintiffs have failed to show deliberate indifference on the part of any named defendant. Indeed, with respect to former Commissioner Coombe—the only defendant from whom plaintiffs seek damages—the evidence showed that he engaged in careful planning prior to proposing double-celling at

Woodbourne. There is no evidence that he has acted in disregard of inmates' rights, or that he was on notice of a serious threat of harm to any of the plaintiffs.

215. The evidence did not establish that defendants were indifferent to inmates' safety. Defendants considered whether an inmate was violent or victim-prone before placing him in a double cell.

216. There was no evidence of serious security problems that resulted from double-celling. The testimony adduced only two incidents of physical altercations in double cells, one of dubious credibility.

217. The statistics showed an increase in the number of unusual incidents, use of force, and disciplinary reports in the first year after implementation of double-celling at Woodbourne. These statistics, however, are not conclusive. The evidence did not establish a cause and effect relationship between the practice of double-celling and an increase in violence at Woodbourne. There was credible evidence that the increase in unusual incidents may have been in part due to an increase in the numbers of inmates at Woodbourne as well as an increase in gang activity. Second, the numbers are not high as compared with comparable facilities. Finally, the most recent statistics demonstrate that any increase may have been short lived. In 1996, the numbers of disciplinary reports, unusual incident reports, and use of force reports decreased.

218. Plaintiffs also failed to establish that defendants were deliberately indifferent to plaintiffs' health. All inmates undergo a comprehensive medical screening upon reception into the DOCS system. Woodbourne developed guidelines for double-celling that set forth the medical conditions that would require an inmate to be housed in a single cell or in a lower bunk.

219. There is no evidence that any of the plaintiffs had a medical condition that rendered double-celling a threat to his health. Although Waldo claimed that the bunk bed bothered his back because of his scoliosis, he testified that when he arrived at Woodbourne he told medical staff that his back was not bothering him. Tr. 243. Subsequently, however, when brought to the officials' attention, a cell swap was arranged so that he could have a better bed. Tr. 251. Indeed, Waldo had elected not to move to another gallery earlier because he was "all right" with his then current cellmate. Tr. 251.

220. There was an abundance of evidence regarding DOCS' TB policy which negates any inference that defendants were or are indifferent to inmates' risk of contracting TB from their cellmates. Plaintiffs alleged that defendants' failure to take an additional PPD test of inmates prior to double-celling them was evidence of their deliberate indifference to inmates' health. The evidence does not support this. There was credible testimony that administering another PPD test prior to double-celling inmates is not the most efficient or effective means of detecting whether an individual has active TB. Prior to double-celling, inmates' medical records are reviewed and inmates are examined for symptoms of TB. Inmates that portray any signs of active TB are excluded from double cells and are isolated from the population.

221. Plaintiffs did not prove that defendants are indifferent to the risks associated with double-celling inmates who are HIV positive or who are afflicted with AIDS. *See Deutsch v. Federal Bureau of Prisons*, 737 F.Supp. 261 (S.D.N.Y.1990), *aff'd* 930 F.2d 909 (2d Cir.1991). Plaintiffs would like this Court to make the inference that merely placing those inmates who suffer from AIDS in a double-cell demonstrates their deliberate indifference to the health and safety of inmates. The evidence, however, demonstrated that defendants have considered the reasons for not establishing a per se exclusion from double-celling inmates with AIDS. Defendants elicited credible evidence that a per se exclusion might prove more harmful to the health of inmates by creating a false sense of security among those inmates who attempt to engage in high-risk behavior. Instead, defendants educate inmates regarding the ways in which AIDS is spread. This Court makes no finding with regard to whether the practice of housing inmates with AIDS might under other circumstances rise to the level of an Eighth Amendment violation. Rather, based on the evidence elicited during trial,

including the lack of evidence that AIDS is being spread in double cells and evidence that careful consideration is given to those inmates who are severely debilitated from AIDS prior to housing them in a double cell, plaintiffs have not demonstrated an Eighth Amendment violation.

### Due Process

 222. Plaintiffs' due process claim lacks merit. The Due Process Clause creates no liberty interest in inmates' being free from double-celling. In *Bell v. Wolfish,* 441 U.S. 520, 542, 99 S.Ct. 1861, 1875, 60 L.Ed.2d 447 (1979), in the context of pretrial detainees, the Supreme Court explicitly rejected the notion "that there is some sort of 'one man, one cell' principle lurking in the Due Process Clause of the Fifth Amendment."

223. In *Sandin v. Conner,* the Supreme Court recognized that states may create protected liberty interests in the freedom from restraint that "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484, 115 S.Ct. at 2300.

224. Thus, in order to establish a liberty interest implicating the due process clause, plaintiffs must show that they suffered an atypical and significant deprivation and that the State has granted its inmates, by regulation or by statute, a protected liberty interest. *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). In this case, the evidence demonstrates that neither is true.

225. The evidence at trial established that double-celling was not atypical in 1995 when Woodbourne began housing inmates in double cells. Most state prison systems and the federal prisons had double-celling. D-82 at 4; Tr. 1248 (Martin); Tr. 1816–17 (Quinlan).

226. The evidence at trial did not demonstrate that double-celling at Woodbourne was a significant deprivation for the inmates or that it had any significant effect on any of the "ordinary incidents of prison life." After double-celling was implemented, inmates had the same access to extensive programs and services. There was no evidence of "overcrowding" in the sense that the facility had to compromise its services in order to handle the additional number of inmates.

227. New York has not created a liberty interest in single cell housing. This Court does not find that a liberty interest in single housing was created by implication merely from the fact that prior to 1995 no New York prison facility had implemented double-celling.

228. As set forth above, this Court finds that plaintiffs are entitled to neither injunctive relief against defendants, nor monetary damages against defendant Coombe, nor declaratory relief. Accordingly, judgment should be entered in defendants' favor.